# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00416-CV

---

**Robert Francis O'Rourke, Appellant**

**v.**

**Kelcy Warren, Appellee**

---

### FROM THE 424TH DISTRICT COURT OF SAN SABA COUNTY
### NO. 10,204, THE HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

---

## O P I N I O N

In the underlying proceeding, appellee Kelcy Warren sued appellant Robert Francis O'Rourke for defamation, alleging that O'Rourke legally defamed him by making statements during O'Rourke's gubernatorial campaign that equated Warren's political donations to Governor Greg Abbott with crimes. O'Rourke responded that the statements were not about Warren, and insofar as they mention Warren, were opinions that colloquially used the terms "bribery" and "corruption" consistent with the sharp language used in political campaigns. After the trial court denied O'Rourke's motion to dismiss under the Texas Citizens Participation Act (TCPA), O'Rourke filed this appeal. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(12) (permitting interlocutory appeal from denial of TCPA motion to dismiss).

We hold that an examination of the statements and their context from the position of a reasonable person shows they are non-actionable opinions and fall within the bounds of protected speech. Because O'Rourke properly invoked the TCPA and Warren failed to adduce

evidence of defamation in response, the trial court erred in failing to grant O'Rourke's motion to dismiss.

## BACKGROUND

This defamation lawsuit arose out of a series of statements made by O'Rourke on Twitter, at press conferences, and at rallies during his campaign as the Democratic nominee in the 2022 Texas gubernatorial election. After Winter Storm Uri brought extreme winter weather to Texas in February 2021—knocking out power for millions and causing the deaths of at least 210 people and more than $80 million estimated damages[1]—Governor Abbott's response to the electrical grid vulnerabilities and the campaign contributions he received from the energy industry after the legislative session became major issues of contention between the candidates in the gubernatorial campaign.

Relevant to this appeal, Warren alleges that O'Rourke made a series of defamatory campaign statements about him between December 30, 2021, and March 7, 2022. Warren contributed $1 million toward Governor Abbott's re-election campaign in June 2021, and Warren averred in his pleadings that O'Rourke defamed him by falsely stating that he committed the crimes of extortion, bribery, and corrupt influence relating to that campaign contribution. The statements referenced in Warren's pleading are summarized below:

- **December 30, 2021**: In response to a tweet by Governor Abbott that "Texas power plants have made the upgrades needed to protect against cold weather" and that "They are good to go," O'Rourke responded that "We won't be 'good to go' until gas supply companies are ready for cold weather. But you let them off the hook b/c gas CEOs like Kelcy Warren donated millions to your reelection

---

[1] Jess Donald, *Winter Storm Uri 2021: The Economic Impact of the Storm*, Texas Comptroller of Pub. Accounts (Oct. 2021), https://comptroller.texas.gov/economy/fiscal-notes/2021/oct/winter-storm-impact.php.

campaign after the grid failure.  We need a governor who looks out for Texans, not corporate donors."[2]

- **January 4, 2022**: In a tweet thread, O'Rourke stated that the Texans who lost their lives in Winter Storm Uri "were killed by the incompetence and corruption of Abbott who was warned repeatedly about the grid's vulnerabilities but did nothing.  And after the grid failed and hundreds died, he STILL did nothing. We could see more tragedy the next time Texas experiences extreme weather."[3]

  In a subsequent tweet O'Rourke expanded that "Recent reports show the gas sector (#1 contributor to the grid failure) is just as unprepared for extreme weather now as it was in February.  Abbott hasn't required gas supply CEOs to do anything, perhaps because they've donated millions to his campaign since the grid collapsed."[4]

- **January 20**: Replying to a tweet by the Texas Tribune that "[a] pipeline company threatened to cut off natural gas" because of a financial dispute, which "could impact the electric supply of hundreds of thousands of Texans," O'Rourke stated that "Gas supply companies made $11B when the grid failed.  Abbott put their profits over our lives. Why?  Because they bought him off. Looks like they're trying to do it again.  We've got to make a change in Texas."[5]

  Replying to a Bloomberg tweet linking an article about the plunging natural gas supply during the winter months, O'Rourke tweeted "The grid won't be fixed until Abbott requires gas supply companies to prepare for cold weather.  Why hasn't he?  The CEOs of those companies are his largest campaign contributors.

---

[2]     Beto O'Rourke (@BetoORourke), Twitter (Dec. 30, 2021, 3:27 PM), https://twitter.com/BetoORourke/status/1476666390635495436.

[3]     Beto O'Rourke (@BetoORourke), Twitter (Jan 4, 2022, 3:54 PM), https://twitter.com/BetoORourke/status/1478485133485391877.

[4]     Beto O'Rourke (@BetoORourke), Twitter (Jan 4, 2022, 3:54 PM), https://twitter.com/BetoORourke/status/1478485135049777157.

[5]     Beto O'Rourke (@BetoORourke), Twitter (Jan 20, 2022, 9:46 AM), https://twitter.com/BetoORourke/status/1484190554275692546.

They win.  He wins.  Texans lose."[6]

Later that same day, WFAA, a Dallas television station, tweeted about "power to 400,000 homes is being used as leverage" in a fight between "two Texas energy giants," and O'Rourke responded that "Gas company Energy Transfer Partners says: 'give us $22M or we cut the power for Texans.'  That's extortion. Abbott isn't stopping them because their CEO bought him off with a $1M check.  That's corrupt.  I will fix the grid & hold extortionists and corrupt officials to account."[7]

- **February 1**: O'Rourke appeared on a cable news program to discuss another approaching winter storm and the preparedness of the electrical grid.  During that interview, he stated "[Governor Greg Abbott] has done nothing to fix the major culprit in the power outage last year, which was the lack of winterization of the gas supply.  That might have something to do with the fact that those in that industry have given him millions of dollars since the February freeze, including Kelcy Warren, whose company made $2.4 billion dollars in February [2021] off the suffering of our fellow Texans and wrote Greg Abbott a $1 million dollar campaign contribution check.  That explains the otherwise inexplicable, as to why we haven't fixed the grid as we head into another winter."[8]

- **February 4**: At a 20-minute press conference where O'Rourke discussed his policy goals for improving the electrical grid, O'Rourke stated "The Governor, again, despite every warning and guidance from the energy experts that we needed to winterize the gas supply, failed to do that.  And this is the explanation for the otherwise inexplicable—why wouldn't he do that?  Given how many people lost their lives, how badly this hurt the state of Texas.  It's because he was paid not to.  Kelcy Warren's company, Energy Transfer Partners, made $2.4 billion dollars over those five days that people were dying and suffering in the State of Texas.  $2.4 billion dollars.  Right at the end of the regular legislative session following that winter storm, he wrote Greg Abbott a $1 million dollar check.  Looks a lot like a bribe to me.  And the consequence was, Greg Abbott did not force him or anyone else to weatherize their facilities, or the gas supply, to

---

[6]    Beto  O'Rourke  (@BetoORourke),  Twitter  (Jan  20,  2022,  11:28  AM), https://twitter.com/BetoORourke/status/1484216295361060867.

[7]    Beto  O'Rourke  (@BetoORourke),  Twitter  (Jan  20,  2022,  1:08  PM), https://twitter.com/BetoORourke/status/1484241368595763201.

[8]    MSNBC, *Beto O'Rourke Rips Abbott's Texas Freeze Failure—And Inaction to Prevent Another*, YouTube (Feb. 1, 2022), https://www.youtube.com/watch?v=PvBODr3Mh40.

protect the people of Texas going forward."[9]

O'Rourke separately tweeted "When I'm governor, we'll fix the power grid and never allow energy companies to steal from us again. The corruption stops here." Included in the tweet was a clip from the same press conference where he listed his priorities as the future governor, including "Point number four. We've gotta make sure that there is justice. That $11 billion dollars in profit was highway robbery. [Energy companies] took that money from the people of Texas and they broke the law in the process. There is a state statute that specifically prohibits charging exorbitant prices on gas and fuel during a declared disaster or emergency. That's exactly what these companies—who paid off Greg Abbott after the fact—did. When I'm governor, I'm going to get that money back for the people of Texas and return it to the people of Texas."[10]

Later that same day, O'Rourke tweeted "Energy executives robbed us while Texans froze to death. Abbott let it happen because they gave him a cut. Now each of us will pay $20-$50 more a month on our utility bills because of it. That's the #AbbottTax." He also included a clip from a campaign rally where he reiterated that $11 billion was made by energy companies during the 2021 winter storm, that ratepayers now have to pay higher rates because of it, and that "all of the ratepayers, millions of us, spread out across the state, are paying back into those energy companies, and energy traders, and gas supply CEOs, so they can have extraordinary wealth at the expense of the people of this state."[11]

- **February 5**: O'Rourke tweeted "Why hasn't Abbott done everything in his power to fix the power grid? Corruption." That tweet contained a clip of another campaign rally, where he stated "Why didn't the Legislature – Or the Governor – require the gas suppliers to weatherize their equipment? It's interesting. When they're in session, the legislators and the governor cannot take campaign contributions. It's almost as though we acknowledge that contributions could affect what the legislators and the governor might do when they're in session. So we wait until they are safe, out of harm's way, for them to start taking the cash. Within 10 days of the end of the first session of that legislature, Greg Abbott takes more than $4.6 million dollars from the energy industry—the same people who

[9] Beto O'Rourke, *Kicking off the Drive for a brighter Texas!*, Facebook (Feb. 4, 2022), https://www.facebook.com/betoorourke/videos/498764985011316.

[10] Beto O'Rourke (@BetoORourke), Twitter (Feb 4, 2022, 12:28 PM), https://twitter.com/BetoORourke/status/1489667156631511043.

[11] Beto O'Rourke (@BetoORourke), Twitter (Feb 4, 2022, 8:31 PM), https://twitter.com/BetoORourke/status/1489788837240975360.

did not want their equipment weatherized because they'd have to invest in it and pay for it. I don't know what the legal term for that is – it looks a lot like a bribe to me. When you consider that those same gas supply companies and energy traders over a five-day period in February made $11 billion dollars in profit. While you were freezing in your homes, while [a person] was dying in his, you might understand the connection between the money made – the money paid out in political contributions – and the inaction of the governor and those in a position of power and public trust in this State."[12]

- **February 6**: O'Rourke tweeted "Abbott got paid off not to fix the grid — and the lights turned off because of it," and attached a video from a Wichita Falls campaign rally where he stated "And then, in the days following the legislative session where the Governor, and the Republican majority, did nothing to protect this grid, they turned around and gave Greg Abbott $4.6 million dollars in campaign contributions over just 10 days. So why did, why did Greg Abbott not fix the grid? They paid him not to fix the grid."[13]

- **February 7**: O'Rourke tweeted "For Abbott's top donors, the grid failure meant getting rich. For the people of Texas, it meant losing light, limbs, and lives. As governor, I will fix the grid and put people over profits EVERY single time," and included a video clip from a campaign rally discussing a man who had both legs amputated because of injuries sustained from Winter Storm Uri and stated "This didn't have to be our fate, this didn't have to be our fortune. This was no act of God or Mother Nature. This was the failing of the person in the highest position of power and public trust in this state. Someone who we could not count on to deliver the power to the people when we needed it the most. But he didn't trust the experts, he didn't trust the people. Instead, he looked to his donors in the gas industry, the energy traders who filled his campaign coffers, and ignored the rest of us. Hundreds of our fellow Texans lost their lives. And for no good reason. Let's make sure that there is justice, and consequences for those who broke the law, and let's make sure that law is never broken again."[14]

- **February 10**: O'Rourke's campaign posted a video of a San Antonio campaign

[12] Beto O'Rourke (@BetoORourke), Twitter (Feb 5, 2022, 3:06 PM), https://twitter.com/BetoORourke/status/1490069303089106946.

[13] Beto O'Rourke (@BetoORourke), Twitter (Feb 6, 2022, 4:40 PM), https://twitter.com/BetoORourke/status/1490455331239079943.

[14] Beto O'Rourke (@BetoORourke), Twitter (Feb 7, 2022, 9:31 AM), https://twitter.com/BetoORourke/status/1490709700932943872.

rally, where during the course of his discussion about Governor Abbott's actions, O'Rourke stated "Those energy CEOs, those people who over the course of five days last February—while people were literally dying in their homes . . . these energy companies, and energy traders, these donors to Greg Abbott, made $11 billion dollars in profit over the course of five days. And when the Legislative session wrapped up without a single action taken to require them to weatherize the grid or prevent that kind of destruction and death again. They turned around and gave him $4.6 million dollars in just the first ten days after that legislative session. One man, whose company made $2.4 billion dollars in February, literally wrote Greg Abbott a $1 million dollar check. So when you ask yourself, how in the world can he have failed to protect us going forward into the next extreme weather event, it's because they paid him not to. That's pretty close to a bribe, by any definition I'm familiar with. And so those who robbed us, because they controlled the gas supply, and literally the ways in which we were going to heat our homes and keep one another alive. When they made that extraordinary obscene profit, and then turned around and paid Abbott to do nothing, we, all of us, are paying the price."[15]

- **February 14**: O'Rourke tweeted "Abbott's big donors got billions while families froze. Abbott got millions in campaign checks. What'd we get? The Abbott Tax" and embedded a campaign advertisement featuring a collection of local news coverage about the higher utility bills for Texans after the winter storm. The ad included a clip from O'Rourke's February 6, 2022 campaign rally where he stated "why did Greg Abbott not fix the grid? They paid him not to fix the grid."[16]

Warren filed suit on February 22, 2022, alleging that O'Rourke's statements during the campaign were defamation, slander, and libel. On March 7, 2022, O'Rourke held a press conference during which he discussed the defamation lawsuit brought by Warren and "the

---

[15] Beto O'Rourke, *Back in San Antonio for Keeping the Lights On: A Statewide Drive for a Brighter Texas - San Antonio*, Facebook (Feb. 10, 2022), https://www.facebook.com/beto orourke/videos/4389568934482152/. Warren also referenced a tweet by a political reporter that quoted O'Rourke's statement at the campaign rally. *See* Jeremy Wallace (@JeremySWallace), Twitter (Feb 10, 2022, 1:08 PM), https://twitter.com/JeremySWallace/status/149 1851477207375872.

[16] Beto O'Rourke (@BetoORourke), Twitter (Feb 14, 2022, 8:33 AM), https://twitter.com/BetoORourke/status/1493232016359403520.

facts around the power grid failure."[17]  During the press conference, O'Rourke referenced numerous statements by Governor Abbott, cited statistics about the loss of life and economic damages caused by Winter Storm Uri, and presented a demonstrative that "while Texans froze to death, energy corporations made billions."  O'Rourke also made the following statements relevant to the present appeal:

> So, to connect the dots.  Abbott does nothing, including failing to require the gas companies to weatherize ahead of the winter storm.  The winter storm happens, and kills hundreds of people, costs us more than $300 billion, and he requires them to do nothing, and does not get those illegal profits back.  They turn around and give him $4.6 million dollars in campaign contributions within the first ten days of the open season of political donations.  "For some energy experts," this is a quote from the Texas Tribune, "For some energy experts, the increase in donations for the officials at the close of the session looks like a reward for not passing more stringent regulations."  That's not Beto O'Rourke saying that, that is reported in the Texas Tribune.

> Energy Transfer Partners, Kelcy Warren's company, made $2.4 billion dollars during those five days of the freeze.  And, this is the Houston Chronicle headline: "We froze, and Abbott got paid $1 million dollars from the billionaire profiteer of Texas' deadly storm."  A $1 million campaign check with Abbott's name on it.  So again, Kelcy Warren's company, made extraordinary windfall profits—$2.4 billion dollars—far more than they had ever made, probably ever dreamed of making before, he turns around, and as soon as he is able to, writes a $ 1 million campaign contribution check to Greg Abbott.

> . . . .

> Everything that I've shared with you is factual, and has been reported by either yourselves or your colleagues in the press here in the State of Texas.  All I have done today, and all I have done over the course of the campaign, is to share these facts with the electorate that will decide the outcome of this next election.

---

[17]  Beto O'Rourke (@BetoORourke), Twitter (Mar. 7, 2022, 1:32 PM) https://twitter.com/BetoORourke/status/1500917314761355274.

. . . .

But I want you to know this is happening. Not only is [Warren] trying to influence the political process through the campaign donations he is making. Not only did he make illegal windfall profits off the suffering and misery and death of our fellow Texans, he's now trying to shut us down in the courts through a frivolous lawsuit.

. . . .

So what Greg Abbott did, and this was the corrupt deal that I'm trying to call everyone's attention to, is, he gave Kelcy Warren and others free license to charge as much as they wanted to. . . . He was clearly looking out for the energy companies, and the CEOs, and his political donors, instead of the people of Texas, and the consequences fell to the people of Texas.

. . . .

[In response to a reporter's question about O'Rourke's statement that Governor Abbott "effectively killed Texas residents"] I do, absolutely. . . . Greg Abbott chose his donors and political contributors over the people of Texas, and the people of Texas paid the price.[18]

On March 7, O'Rourke also tweeted that "While Abbott and his big corporate donors look out for one another, we are looking out for the people of Texas." He also included a clip from a College Station campaign rally where he made the following statement:

I would argue they have paid [Governor Abbott] to look the other way, to not fix the problem, and also, to not claw back the $11 billion dollars in illegal profits that they made while people were freezing to death in the State of Texas. Your question, what are we going to do differently going forward? . . . We're going to make sure we hold those accountable . . . not just the $11 billion that they stole from us, but let's go after double or treble damages . . . . You [the attendees] are paying for the profits of the energy company CEOs who stole from us and our

---

[18] *Id.*

fellow Texans.[19]

Finally, news coverage of a March 21, 2022 campaign rally in Lubbock described O'Rourke as "question[ing] Abbott's connections to electric companies and utility providers that recorded large profits during the storm" and quoted O'Rourke as saying: "If that is not corruption, I don't know what is."[20]

Warren amended his petition to include these additional comments, and thereafter O'Rourke timely moved to dismiss pursuant to the TCPA. *See* Tex. Civ. Prac. & Rem. Code § 27.003(b). The trial court held a hearing on June 16, 2022, and then summarily denied the TCPA motion on July 5, 2022. This timely appeal followed. *See id.* § 51.014(12); Tex. R. App. P. 28.1(a).

## STANDARD OF REVIEW

We review de novo a trial court's ruling on a TCPA motion to dismiss, including whether each party has carried its respective burden under the TCPA. *See Long Canyon Phase II & III Homeowners Ass'n v. Cashion*, 517 S.W.3d 212, 217 (Tex. App.—Austin 2017, no pet.); *see also Dolcefino v. Cypress Creek EMS*, 540 S.W.3d 194, 199 (Tex. App.—Houston [1st Dist.] 2017, no pet.). To determine whether the dismissal of a legal action is warranted, we "consider the pleadings, evidence a court could consider under Rule 166a, Texas Rules of Civil Procedure, and supporting and opposing affidavits stating the facts on which the liability or defense is based." Tex. Civ. Prac. & Rem. Code § 27.006(a). We review the pleadings and evidence in the

---

[19] Beto O'Rourke (@BetoORourke), Twitter (Mar. 8, 2022, 3:20 PM) https://twitter.com/BetoORourke/status/1501306847881576451.

[20] Hannah Holtz, *Beto O'Rourke makes campaign stop in Lubbock, talks public education, healthcare, jobs*, KCBD11 (Mar. 21, 2022), https://www.kcbd.com/2022/03/21/beto-orourke-makes-campaign-stop-lubbock-talks-public-education-healthcare-jobs/.

10

light most favorable to the nonmovant. *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 801 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020).

## DISCUSSION

The TCPA "protects citizens from retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). "The TCPA was designed to protect both a defendant's rights of speech, petition, and association and a claimant's right to pursue valid legal claims for injuries the defendant caused." *Montelongo v. Abrea*, 622 S.W.3d 290, 295 (Tex. 2021); *see also* Tex. Civ. Prac. & Rem. Code § 27.002 (explaining purpose includes "encourag[ing] and safeguard[ing] the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law"). "The Legislature has instructed that the TCPA 'shall be construed liberally to effectuate its purpose and intent fully.'" *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (quoting Tex. Civ. Prac. & Rem. Code § 27.011(b)).

Our review of a trial court's ruling on a TCPA motion to dismiss requires a three-step analysis. *Youngkin v. Hines*, 546 S.W.3d 675, 679 (Tex. 2018) (describing three-step analysis under prior version of TCPA). First, a party seeking dismissal bears the burden of showing that the TCPA applies to the non-movant's "legal action"; that is, the movant must demonstrate that the non-movant's legal action "is based on or is in response to the party's exercise of the right of free speech; right to petition; or right of association." Tex. Civ. Prac. & Rem. Code §§ 27.003(a),.005(b). If the movant meets that burden, the trial court must dismiss the action unless the nonmovant "establishes by clear and specific evidence a prima facie case

for each essential element of [his] claim." *Id.* § 27.005(c); *see also In re Lipsky*, 460 S.W.3d at 586. If the nonmovant establishes a prima facie case, the court must still "dismiss a legal action against the moving party if the moving party establishes an affirmative defense or other grounds on which the moving party is entitled to judgment as a matter of law." Tex. Civ. Prac. & Rem. Code § 27.005(d).

*Whether the TCPA applies to the defamation cause of action*

We first address whether O'Rourke demonstrated that the lawsuit "is based on or is in response to" his "exercise of the right of free speech; right to petition; or right of association." *Id.* § 27.005(b). O'Rourke argues that his statements were political speech "made in connection with a matter of public concern," *id.* § 27.001(3), and therefore constituted the "exercise of [his] right of free speech," *id.* §§ 27.003(a), .005(b). Warren counters that O'Rourke's statements did not relate to a "matter of public concern" because Warren is a private citizen and the political contributions were not part of a pre-existing public debate. We agree with O'Rourke.

A party exercises its right of free speech when it makes "a communication made in connection with a matter of public concern." *Id.* § 27.001(3). A "communication" includes "the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1). In analyzing whether the TCPA applies to Warren's lawsuit, we focus on Warren's pleadings as the "best and all-sufficient evidence of the nature of the action," *see Crossroads Cattle Co. v. AGEX Trading, LLC*, 607 S.W.3d 98, 102 (Tex. App.—Austin 2020, no pet.) (quoting *Hersh v. Tatum*, 526 S.W.3d

12

462, 467 (Tex. 2017)), but also consider the pleadings and other evidence "in the light most favorable to the nonmovant and prevailing party below," *id*.

Warren's amended petition clearly demonstrates that his defamation claim is based on or in response to communications made by O'Rourke during the gubernatorial campaign. *See LMP Austin Eng. Aire, LLC v. Lafayette Eng. Apartments, LP*, 654 S.W.3d 265, 283–84 (Tex. App.—Austin 2022, no pet.) (explaining that, "[a]t a minimum," former statutory phrase "'based on, relates to, or is in response to' . . . encompasses a 'legal action' that is factually predicated on the alleged conduct that falls within the scope of the TCPA's definition of the exercise" of protected constitutional rights (quoting former Tex. Civ. Prac. & Rem. Code § 27.005(b) (amended 2019))). Accordingly, the only dispute concerns whether O'Rourke's statements relate to a "matter of public concern."

A "matter of public concern" includes a statement or activity regarding:

(A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;

(B) a matter of political, social, or other interest to the community; or

(C) a subject of concern to the public.

Tex. Civ. Prac. & Rem. Code § 27.001(7). "To be a matter of public concern, a claim must have public relevance beyond the interests of the parties." *Szymonek v. Guzman*, 641 S.W.3d 553, 565 (Tex. App.—Austin 2022, pet. denied) (quoting *Morris v. Daniel*, 615 S.W.3d 571, 576 (Tex. App.—Houston [1st Dist.] 2020, no pet.)); *accord Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 136 (Tex. 2019). Warren concedes that Winter Storm Uri and the failure

13

of the electricity grid resulting from that storm are matters of public concern. He argues, however, that O'Rourke's communications as far as they concern Warren and his political contribution do not relate to matters of public concern. We disagree.

The statements by O'Rourke about Warren are embedded within, and relate to, his broader public statements about Governor Abbott about Winter Storm Uri and the electrical grid. *See Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017) (explaining public matters include subjects of legitimate news interest); *see also* Tex. Civ. Prac. & Rem. Code § 27.001(7)(A) (including statements about "a public official"). We cannot consider the phrases and sentences about him in isolation from the broader context in which they appear: political attacks on the governor, a public official, on subjects that Warren concedes are matters of public concern. *See Brady*, 515 S.W.3d at 884 (determining whether speech addresses matter of public concern based on "content, form, and context . . . as revealed by the whole record" (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985) (plurality opinion)). Moreover, a "logical nexus" exists between the references to Warren's political contribution and the broader issues discussed in the communications. *See id.* at 885 (explaining that details contained in communications are "reasonably included as a matter of public concern" if logical nexus exists between details and general subject matter of communications).

Even assuming we can excise the Warren-specific details and consider them in isolation, campaign contributions are a form of political speech, s*ee, e.g.*, *Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association."), and campaign-finance disclosure requirements are premised on the idea of exposing large contributions "to the light of publicity" so that the

14

public may be informed about the sources of election spending, *see McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 223 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per curiam)); *see also Szymonek*, 641 S.W.3d at 565 (explaining matters of public concern include topics having public relevance beyond parties' interests).  We are not saying that every campaign contribution, no matter the amount, qualifies as a matter of public concern; but in the present case, Warren's specific political contribution was already a matter of public concern, having been discussed in news coverage for months before O'Rourke made his statements.  *See Szymonek*, 641 S.W.3d at 565; *see also* Editorial Board, *We froze and Abbott got paid - $ 1 million from the billionaire profiteer of Texas' deadly storm*, Houston Chron. (Aug. 1, 2021), https://www.houstonchronicle.com/opinion/editorials/article/Editorial-We-froze-and-Abbott-got-paid-1-16354431.php ("It's only fair to ask what the billionaire investor [Warren] got in return for his million smackolas."); Justin Miller, *Abbott Received Massive Contribution from Texas Blackout's Biggest Profiteer,* Texas Observer (July 20, 2021),  https://www.texasobserver.org/after-kelcy-warrens-energy-transfer-partners-made-billions-from-the-deadly-texas-blackouts-he-gave-1-million-to-greg-abbott/ ("The unusually large contribution from the blackout's biggest profiteer raises questions about Warren's influence over the governor and has prompted outrage at what many see as a blatant political kickback for kowtowing to the powerful natural gas industry.").

The pleadings and record demonstrate that O'Rourke's alleged communications about Warren's political contribution were made in connection with matters of public concern, *see* Tex. Civ. Prac. & Rem. Code § 27.001(3), and therefore the TCPA applies to Warren's defamation lawsuit, *id.* § 27.005(b).

15

*Whether Warren stated a prima facie case of defamation*

Because O'Rourke demonstrated that the TCPA applies to Warren's lawsuit, the burden shifted to Warren to establish by clear and specific evidence a prima facie case for each essential element of his defamation claim. *See id.* § 27.005(c). "Prima facie case" refers to evidence that is "sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 54 (Tex. 2021) (quoting *In re Lipsky*, 460 S.W.3d at 590). "Clear and specific evidence" means that a "plaintiff must provide enough detail to show the factual basis for its claim." *Id.* (quoting *Bedford v. Spassoff*, 520 S.W.3d 901, 904 (Tex. 2017)); *see also* Tex. Civ. Prac. & Rem. Code § 27.005(c). "To prevail on a claim of defamation, a plaintiff must prove '(1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases.'" *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 363 (Tex. 2023) (quoting *In re Lipsky*, 460 S.W.3d at 593).[21]

We first consider whether O'Rourke's statements in context are false statements of fact or non-actionable opinions. "Whether a statement is an opinion is a question of law." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018). We analyze the statements "from the perspective of a reasonable person's perception of the entirety of the communication, not from isolated statements." *Lilith Fund*, 662 S.W.3d at 363. Such a reasonable person reads the communications "in their entirety[,] . . . is aware of relevant

---

[21] The Supreme Court issued its decision in *Lilith Fund* after oral arguments were held in the present appeal. *See Bowen v. Aetna Cas. & Sur. Co.*, 837 S.W.2d 99, 100 (Tex. 1992) (per curiam) ("A decision of the Supreme Court operates retroactively unless this Court exercises its discretion to modify that application."); *see also Balderas-Ramirez v. Felder*, 537 S.W.3d 625, 635–36 (Tex. App.—Austin 2017, pet. denied) (same).

contemporary events," and "is also cognizant of the speaker's method and style of dissemination." *Id.* at 363–64.

Ultimately, we consider whether "the overall language conveys a personal viewpoint about the facts." *Id.* at 364. A statement is not legally defamatory if either it cannot be verifiably false, *Tatum*, 554 S.W.3d at 639 (citing *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013)), or if the statement may be verifiably false but "the context of those statements discloses that they reflect an opinion," *Lilith Fund*, 662 S.W.3d at 363. "Any limitation that defamation law places on free speech . . . may not muzzle a speaker from asserting an opinion in an ongoing debate about the law." *Id.* at 362.

We first consider the context in which the statements were made. *See id.* at 364 (reviewing historical context before analyzing statements).[22] A reasonable reader would be well acquainted with the 2022 gubernatorial campaign between O'Rourke and Governor Abbott, during which the Texas electrical grid was one of the major political issues discussed by the candidates. *See, e.g.*, Niki Griswold, *How the politics of the power grid failures could play into the 2022 election*, SpectrumNews (Dec. 8, 2021), https://spectrumlocalnews.com/tx/south-texas-el-paso/news/2021/12/08/how-the-politics-of-the-power-grid-failures-could-play-into-the-2022-election ("It's a top issue on the campaign trail for Texas Democrats like Beto O'Rourke, who

---

[22] The Texas Supreme Court does not specify the bounds of this contextual review. *See Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355, 364–67 (Tex. 2023). Normally, a trial court reviews a TCPA motion based on the pleadings, their accompanying affidavits, and any evidence that could be considered under Rule 166a of the Texas Rules of Civil Procedure. *See* Tex. Civ. Prac. & Rem. Code § 27.006(a). The Supreme Court, however, undertook a broader review when considering the historical context of the abortion debate in *Lilith Fund*. *See, e.g.*, 662 S.W.3d at 364–67 & n.58, 59, 61–64 (considering political-party platforms, historical sources, newspaper articles, and social-media posts). This is unsurprising given a reasonable reader is "aware of relevant contemporary events." *See id.* at 363. Accordingly, we follow the Supreme Court's approach in considering the broader context that informs O'Rourke's statements during his gubernatorial campaign.

17

are pushing back against Gov. Greg Abbott's claims that the grid's problems have been addressed."). Moreover, a candidate's speech concerning political issues made during the course of a campaign for public office requires the "fullest and most urgent application" of the First Amendment. *See Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) ("As a result, the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989))). As the Supreme Court has long-recognized, "[t]he protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *See Roth v. United States*, 354 U.S. 476, 484 (1957).

The perceived vulnerabilities of the electrical grid, the preparations taken to safeguard against future severe weather events, and the actions by then-elected officials relating to those topics were all "[d]iscussions of public issues" that "'are integral to the operation' of our system of government." *See Bennett*, 564 U.S. at 734 (quoting *Buckley*, 424 U.S. at 14). Similarly, those political issues were tied to another major event salient to the reasonable reader at the time of the campaign: Winter Storm Uri. For approximately one week in February 2021, Winter Storm Uri "subjected the state's electrical grid to historically unprecedented stress" after a "polar vortex" of super-chilled arctic air moved across Texas and the rest of the United States because of a "perfect storm" of meteorological conditions in the arctic region. *See Luminant Energy Co. v. Public Util. Comm'n of Tex.*, 665 S.W.3d 166, 173 (Tex. App.—Austin 2023, pet. filed). The cold weather "froze poorly winterized natural gas wellheads and gathering lines, nearly halving the supply of the state's predominant fuel for electric generation," *id.* at 174, and this and other consequences of the strain on the electrical grid system led to over two-thirds of all

18

Texans losing power, "at least 210 deaths," and an estimated $80 to $130 billion in storm-related financial losses. Donald, *supra*; *see also World Class Cap. Grp. v. Gibson, Dunn & Crutcher LLP*, No. 03-21-00360-CV, 2023 WL 2697881, at *2 n.1 (Tex. App.—Austin Mar. 30, 2023, no pet. h.) (mem. op.) (referencing Comptroller report and noting "power blackouts affected most of Texas from February 15-18, 2021"). Winter Storm Uri and the blackouts that followed occurred during the 87th regular legislative session of the Texas Legislature, *see Luminant Energy*, 665 S.W.3d at 175, and news coverage at the end of the legislative session focused extensively on whether the Legislature and Governor Abbott adequately addressed the perceived causes of the electrical-grid failures, *see, e.g.*, David Blackmon, *Will Texas Gov. Greg Abbott Keep His Promise To Fix The Grid?*, Forbes (May 31, 2021), https://www.forbes.com/sites/davidblackmon/2021/05/31/texas-gov-greg-abbott-must-keep-his-promise-to-fix-the-texas-grid/?sh=1db717d852a2; Ross Ramsey, *Analysis: The Texas electric grid and the improvements that didn't come*, Texas Tribune (June 7, 2021), https://www.texastribune.org/2021/06/07/texas-ercot-power-grid-legislature/; Morgan O'Hanlon & Robert T. Garrett, *Gov. Greg Abbott signs into law Texas Legislature's response to winter storm*, Dallas Morning News (June 8, 2021), https://www.dallasnews.com/news/politics /2021/06/08/gov-greg-abbott-signs-into-law-texas-legislatures-response-to-winter-storm/; Mose Buchele, *Texas Lawmakers Passed Changes To Prevent Blackouts. Experts Say They're Not Enough*, NPR (June 2, 2021), https://www.npr.org/2021/06/02/1002277720/texas-lawmakers-passed-changes-to-prevent-more-blackouts-experts-say-its-not-eno. Moreover, O'Rourke's statements occurred during the first winter following Winter Storm Uri and the legislative session, with many of the statements occurring while the state braced for more potentially severe weather events. *See, e.g.*, Nataly Keomoungkhoun et al., *North Texas braces for impact as*

19

*winter storm moves into Dallas-Fort Worth*, Dallas Morning News (Feb., 2, 2022), https://www.dallasnews.com/news/weather/2022/02/02/north-texas-braces-for-impact-as-winter-storm-moves-into-d-fw/ ("But even if the storm isn't expected to be as severe as last year's 139-hour freeze . . . the forecast brought back painful memories to many North Texa[n]s . . . ."). O'Rourke's statements would therefore be understood by a reasonable reader who was well acquainted with Winter Storm Uri, the electrical grid's failure, and the broader discussion about the Legislature's and Governor Abbott's response.

At the same time, a reasonable reader would also be well acquainted with the "ongoing, highly publicized, and fervent debate" about campaign donations and the effect of money in politics. *Lilith Fund*, 662 S.W.3d at 364. Federal law governing campaign contributions "grew out of a 'popular feeling' in the late 19th century 'that aggregated capital unduly influenced politics, an influence not stopping short of corruption.'" *Federal Election Comm'n v. Beaumont*, 539 U.S. 146, 152 (2003) (quoting *United States v. Automobile Workers*, 352 U.S. 567, 570 (1957)). The balance between protecting political speech through campaign donations and implementing permissible restrictions on said speech has continued to shift through the present day. *See, e.g.*, *Federal Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1652 (2022) ("This Court has recognized only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance."); *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 388–89 (2000) (explaining that avoiding appearance of corruption is critical "if confidence in the system of representative Government is not to be eroded to a disastrous extent" (quoting *Buckley*, 424 U.S. at 26–27)); *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 497 (1985) ("Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the

20

prospect of financial gain to themselves or infusions of money into their campaigns."). A tailored version of that very debate was already occurring in the months preceding O'Rourke's statements, as others had already questioned whether the actions taken by Governor Abbott and the Legislature on the energy infrastructure (or the perceived lack thereof) were because of the influence of oil-and-gas-industry political donations.[23] *See, e.g.*, Editorial Board, *supra* (opining that "continued, gingerly treatment that the powerful natural gas industry traditionally enjoys from the state government, including from the current governor" was "[t]he most obvious return" received by Warren "in return for his million smackolas"); Miller, *supra*; Mitchell Ferman & Carla Astudillo, *Energy industry showers Gov. Greg Abbott, other Texas politicians with campaign cash after they passed power grid bills*, Texas Tribune (Aug. 4, 2021), https://www .texastribune.org/2021/08/04/texas-energy-industry-donations-legislature/ (explaining elected officials "showered in cash . . . even more than usual" by energy industry after end of legislative session, discussing political contributions made to different officials, and noting some viewed donations "like a reward for not passing more stringent regulations"); *see also Nixon*, 528 U.S. at 391 (explaining that past precedent "demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible" and that evidence "described public revelations by the parties in question more than sufficient to show why voters would tend to identify a big donation with a corrupt purpose").

---

[23] Although there are contribution limits for individuals in federal elections, Texas does not have a contribution limit for individuals for the statewide gubernatorial election. *See generally* Tex. Elec. Code §§ 253.001–.176 (setting individual contribution limits for statewide elections only as to judicial office elections); *see also Buckley v. Valeo*, 424 U.S. 1, 28 (1976) ("Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed.").

21

In this context, considering O'Rourke's statements as a whole "from the perspective of a reasonable person's perception," *Lilith Fund*, 662 S.W.3d at 363, his statements about the governor—which include references to Warren—are the type of non-defamatory opinions a reasonable person would expect during the course of a contentious, statewide political campaign. As an initial matter, many of the statements referenced by Warren in his pleadings—such as some of O'Rourke's tweets on January 4, January 20, and public comments on February 5 and 6—do not refer to Warren at all, but instead identify only Governor Abbott, the energy industry, or natural-gas companies, and are therefore not actionable by Warren. *See id.* at 368 (explaining that speaker's statement was not actionable because it did not sufficiently identify plaintiffs).

As for the statements that do identify Warren, we must consider them "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). All of the statements in question were made during a political campaign—many of them at campaign rallies—and clue the reader that O'Rourke's purpose "is advocacy, not the dissemination of facts." *Lilith Fund*, 662 S.W.3d at 367. Many of the communications do use "vehement, caustic, and sometimes unpleasantly sharp attacks" that often arise in political debates. *Isaacks*, 146 S.W.3d at 154 (quoting *Sullivan*, 376 U.S. at 270). But reasonable readers would understand that claims about a political opponent being corrupt[24] or being beholden to campaign

---

[24] *See, e.g.*, Emily Flitter, *Seeking to regain ground, Trump calls Clinton corrupt and a liar*, Reuters (June 22, 2016), https://www.reuters.com/article/uk-usa-election-idUKKCN0Z81LX (quoting then-Presidential candidate Donald Trump: "Hillary Clinton may be the most corrupt person ever to seek the presidency of the United States"); Chandelis Duster &

contributors or special interests[25] are just the type of "rhetorical hyperbole" that is commonplace and expected during contentious political campaigns. *See Backes v. Misko*, 486 S.W.3d 7, 26 (Tex. App.—Dallas 2015, pet. denied) (explaining that "rhetorical hyperbole" is "extravagant exaggeration [that is] employed for rhetorical effect" and is not actionable as basis for defamation (quoting *American Broad. Cos. v. Gill*, 6 S.W.3d 19, 30 (Tex. App.—San Antonio 1999, pet. denied))); *see also Bentley v. Bunton*, 94 S.W.3d 561, 578 (Tex. 2002) ("The Constitution protects 'statements that cannot reasonably [be] interpreted as stating actual facts about an individual' made in debate over public matters in order to 'provide[ ] assurance that public debate will not suffer from lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation.'" (quotation marks omitted) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990))). Given the political and temporal context, a reasonable person could not understand O'Rourke as conveying verifiable facts about the legality of Warren's political donation. *See Farias v. Garza*, 426 S.W.3d 808, 818 (Tex. App.—San Antonio 2014, pet. denied) ("Accusations of the use of political influence to gain some benefit from government are not defamatory and do not constitute libel per se."),

---

Jamie Ehrlich, *Hillary Clinton says 'corrupt human tornado' Trump won't win reelection*, CNN (Sept. 26, 2019), https://www.cnn.com/2019/09/26/politics/hillary-clinton-cbs-sunday-morning-interview/index.html.

[25] *See* Cruz, Ted, *Campaign 2018: Texas Senate Debate* (Sept. 21, 2018), *available at* https://www.c-span.org/video/?451689-1/texas-senate-debate ("Representing Texas is being there for Texans, but actually standing up fighting for Texans, not George Soros, not big liberal interest, but fighting for the values of the people of Texas."); Aman Batheja & Jay Root, *Lobbyists Provide Campaign Funding, Ammo for Cruz, Dewhurst*, Texas Tribune (July 5, 2012), https://www.texastribune.org/2012/07/05/cruz-hits-dewhurst-money-austin-lobbyists/ (quoting spokesman for then-senate candidate David Dewhurst: "Washington special interests are supporting Ted Cruz because they know he will be beholden to them and help carry out their agenda, which has driven our country further to the brink of disaster").

23

*disapproved of on other grounds by In re Lipsky*, 460 S.W.3d 579.[26]   Rather, they would understand that the gist of O'Rourke's statements—even when using sharp language such as "corrupt" and "like a bribe"[27]—as reiterating his political advocacy that he would be a better governor, couched in the oft-repeated argument that one's political opponent is beholden to their campaign contributors.   *See In re Lipsky*, 460 S.W.3d at 594 (analyzing "gist" of collective statements to determine meaning); *see also* Stephen Gardbaum, *Due Process of Lawmaking Revisited*, 21 U. Pa. J. Const. L. 1, 12 (2018) (explaining that campaign-finance system "has been characterized as 'legalized bribery'"); Zephyr Teachout, Opinion, *Legalized Bribery*, N.Y. Times (Jan. 26, 2015), https://www.nytimes.com/2015/01/26/opinion/zephyr-teachout-on-sheldon-silver-corruption-and-new-york-politics.html ("But legal campaign contributions can be as bad as bribes in creating obligations.  The corruption that hides in plain sight is the real threat to our democracy.").

Warren cites *Bentley*, arguing that O'Rourke's statements accuse Warren of having committed the crimes of bribery and corrupt influence and are therefore defamatory per se.  *See* 94 S.W.3d at 582.  The statements made in *Bentley*, however, are distinguishable. *Bentley* concerned statements about the corruption of public officials.  *See id.*  Warren cannot rely on statements directed at the governor, *see Lilith Fund*, 662 S.W.3d at 367 ("[A] statement must concern the plaintiff to be defamatory."), and the references to Warren, a non-official, that use "corrupt" language do not mention any Penal Code statute, *see id.* at 368.  That is, Warren

---

[26]   The Texas Supreme Court disapproved *Farias* insofar as that decision required a heightened evidentiary standard for demonstrating a prima facie case under the former version of the TCPA.  *See In re Lipsky*, 460 S.W.3d 579, 591 (Tex. 2015).

[27]   Warren also alleged that O'Rourke had defamed him by saying Warren committed extortion, but the only references to extortion in the cited communications are related to energy companies, not Warren.  *See Lilith Fund*, 662 S.W.3d at 368.

reads the statements as saying he violated a criminal statute, but the standard is how a reasonable person would understand those statements in context. *Id.* at 364. A reasonable person would understand such statements not as asserting that Warren had engaged in criminal conduct, but instead as attacking a political opponent with just the type of rhetorical hyperbole that is commonplace in political campaigns.

This case is also unlike *Bentley* where the radio host "repeatedly stated that his accusations of corruption were based on actual fact"; cited specific cases and pointed to court records and public documents; and claimed to have undertaken a lengthy investigation, interviewed persons, and looked into the relevant laws. 94 S.W.3d at 583. The radio host "constantly insisted that his charges were borne out by objective, provable facts" and that he had evidence that "had not [been] disclosed support[ing] his assertions." *Id.* at 583–84. O'Rourke, in contrast, stated that he was not a lawyer, and he did not assert any lengthy investigation or undisclosed evidence supporting his opinions. Warren points to O'Rourke's press conference on March 7 where he stated that "[e]verything I've shared with you is factual" and that he had "share[d] these facts" over the course of the campaign. But the information shared by O'Rourke immediately before those statements concerned the consequences of Winter Storm Uri, the campaign contributions received by Governor Abbott, and selected quotations from newspaper articles. It is clear from the context of the statements that those were the "facts" O'Rourke was referencing, not the sharp attacks O'Rourke peppered in his political campaigning as part of his advocacy for office. *See Lilith Fund*, 662 S.W.3d at 367 (explaining statements directed towards advocacy distinguishable from statements disseminating facts).

The Supreme Court's decision in *Lilith Fund* reinforces that O'Rourke's statements, even when using objectionable language, were opinions that could not be considered

defamatory. In *Lilith Fund*, the Supreme Court concluded that advocacy groups could not state a prima facie case for defamation against a pro-life campaigner who identified the groups as "criminal organizations" and said the groups "exist to help pregnant Mothers murder their babies" and "murder innocent unborn children." *See id.* at 359. The Supreme Court held that a reasonable person, informed about the historical context of the political issue, would understand the campaigner as using language of advocacy to express his opinion on the "legality and morality of that conduct," rather than disseminating false factual information about the advocacy groups. *Id.* at 368. In distinguishing its prior holding in *Bentley*, the *Lilith Fund* court emphasized that *Bentley* was distinguishable because the radio host relied on "undisclosed (and nonexistent)" records "that never occurred to inform" his belief that his corruption accusations were true, "making the statements actionable based on the falsity of the underlying facts." *Lilith Fund*, 662 S.W.3d at 368–69. The *Lilith Fund* court also explained that the campaigner "does not refer to the Penal Code nor to any Texas criminal law"; did not indicate that the advocacy groups had been arrested, prosecuted, or convicted of crimes based on specific conduct; and invoked "a moral premise" to advocate for his beliefs on a political issue. *Id.* at 368.

Just like the pro-life campaigner sued in *Lilith Fund*, O'Rourke did not refer "to the Penal Code nor to any Texas criminal law" when making his statements that mentioned Warren.[28] And while the pro-life campaigner's statements unequivocally ascribed criminality to

---

[28] The only times O'Rourke referenced any statutory provision was when he discussed his policy positions about trying to "claw back" profits made by energy companies during Winter Storm Uri, opining that energy companies had violated state civil law prohibiting exorbitant pricing of certain commodities during a disaster. *See* Tex. Bus. & Com. Code § 17.46(27) (including "taking advantage of a disaster" by "demanding exorbitant or excessive price in connection with the sale or lease of fuel . . . or another necessity" as "false, misleading, or deceptive acts or practices" subject to Deceptive Trade Practices-Consumer Protection Act).

26

the plaintiffs without any qualifiers or clear demarcation that he was expressing an opinion, *see Dickson v. Lilith Fund for Reprod. Equity*, 647 S.W.3d 410, 412 (Tex. App.—Amarillo 2021), *aff'd*, 662 S.W.3d 355 (Tex. 2023), O'Rourke clearly qualified his statements as his subjective, personal belief on a political issue—that the donation "looks a lot like a bribe to me," or "[t]hat's pretty close to a bribe, by any definition I'm familiar with."[29]  Similarly, just as the statements made by the speaker in *Lilith Fund* were understood as opinions in part because they "advance[d] longstanding arguments" on a controversial political issue, 662 S.W.3d at 368, so too must O'Rourke's statements be understood and considered in light of the long-running political debate about the influence (undue or otherwise) of money in politics and the oft-repeated political arguments maligning opponents for being beholden to their campaign contributors.  *See, e.g.*, *Cruz*, 142 S. Ct. at 1653 (explaining line between corruption and influence "may seem vague at times" but line-drawing must "err on the side of protecting political speech rather than suppressing it" (quoting *McCutcheon*, 572 U.S. at 209); *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 259 (2003) (Scalia, J., concurring in part and dissenting in part), *overruled by Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) ("Evil corporate (and private affluent) influences are well enough checked (so long as adequate campaign-expenditure disclosure rules exist) by the politician's fear of being portrayed as 'in the pocket' of so-called moneyed interests.").

Furthermore, the statements in *Lilith Fund* are closer to those prohibited under *Bentley* than the statements at issue here.  Unlike the pro-life campaigner—who expressly

---

[29]  As mentioned above, allegations that O'Rourke's political opponent is corrupt treads a well-worn path in political speech.  *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002) (explaining that calling party "corrupt" may be "merely epithetic in the context of amorphous criticism").

attested that he had personally studied the relevant criminal statutes, law-review articles, and other legal authorities to support his opinions that the Lilith plaintiffs were "murderers," "criminal organizations," and had violated criminal laws, *see, e.g.*, Respondents' Brief on the Merits at 40–42 (May 2, 2022), *Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023)—O'Rourke does not claim he undertook any meaningful research, investigation, or otherwise gathered specialized factual knowledge supporting his opinion, let alone that he had additional undisclosed, secret factual information substantiating his opinions. *See Bentley*, 94 S.W.3d at 583–84. That is, the speaker in *Lilith Fund* explicitly premised his statements about the advocacy groups on factual information derived from his review of publicly available documents; the Supreme Court, however, determined the speaker still stated non-actionable opinions because the statements themselves asserted the speaker's subjective beliefs in the context of the broader political debate on abortion. *See* 662 S.W.3d at 369.

Here, O'Rourke's statements were premised not only on the factual information that Warren had made a campaign donation but also on another opinion repeatedly asserted by O'Rourke: that Governor Abbott did not take sufficient actions to ameliorate the vulnerabilities of the electrical grid. *See Paulsen v. Yarrell*, 537 S.W.3d 224, 235 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("Subjective assertions are not actionable in defamation."). O'Rourke repeatedly stated that companies were "left off the hook" because Governor Abbott "did nothing" to resolve grid vulnerabilities and "hasn't required gas supply CEOs to do anything." But O'Rourke's subjective beliefs about Governor Abbott's performance post-Winter Storm Uri are not objectively verifiable facts; they are his personal opinions about the success and extent of the Governor's actions used to advocate as part of a political campaign. *See Bentley*, 94 S.W.3d at 585 (limiting defamation claims only to statements premised on objectively verifiable facts).

Warren has not directed us to any authority, nor have we located any, holding that a person can assert a "verifiable fact" for purposes of a defamation claim when the context of those statements makes clear that the "fact" is based on another subjective opinion of the speaker. *See Lilith Fund*, 662 S.W.3d at 369 (explaining that, in *Bentley*, radio host's statements were actionable because they were premised "on the falsity of the underlying facts" (citing *Bentley*, 94 S.W.3d at 584)). At most, Warren demonstrates that O'Rourke has a "subjective belief" that Governor Abbott did not do enough to address the electrical grid because of campaign donations, but such beliefs are "not the standard for determining whether a statement of opinion is defamatory." *Id.*

Accordingly, even if *Lilith Fund* marks the outer boundary of statements not considered defamatory, the statements made by O'Rourke fall well short of crossing the Rubicon into defamatory utterances.[30] The fact that these opinions arose during the course of a political campaign as part of political speech advocating for a candidate only further cautions against interpreting them as anything other than non-defamatory advocacy by O'Rourke in support of his political aspirations. *See Cruz*, 142 S. Ct. at 1650 ("The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'" (quoting *Buckley*, 424 U.S. at 14); *see also Lilith Fund*, 662 S.W.3d at 367 (explaining party's opinions about a political issue or governmental officials "right or wrong, are not about" plaintiff); *id.* at 369 ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."

---

[30] Warren also references a March 12, 2022 statement by O'Rourke at a SXSW panel where O'Rourke referred to Governor Abbott as a "thug" and "authoritarian" and referred to Warren as an "oligarch." Those statements, however, amount "to little more than name calling" and are not clear and specific evidence of anything more than an expression of opinion that Warren finds objectionable. *See Associated Press v. Cook*, 17 S.W.3d 447, 454 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

(quoting *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring))). Accordingly, we hold that the challenged statements are non-actionable opinions. Warren has therefore failed to demonstrate "clear and specific evidence" of an essential element of his defamation claim, and his legal action must be dismissed. *See* Tex. Civ. Prac. & Rem. Code § 27.005(c).

## CONCLUSION

We reverse the judgment of the trial court and remand the cause for entry of a judgment of dismissal and further proceedings under any applicable provisions of the TCPA.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Smith

Reversed and Remanded

Filed: June 9, 2023